**UNITED STATES of America,**
**Appellee,**

v.

**Charles KIM, aka "Yong Chull Kim,"**
**Defendant–Appellant.**

**Docket No. 00–1364.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 8, 2000.

Decided April 10, 2001.

---

Jane Simkin Smith, New York, NY, (Larry J. Silverman), for Defendant–Appellant.

David Greenwald, Assistant United States Attorney for the Southern District of New York, New York, NY, (Mary Jo White, United States Attorney, Andrea Likwornik Weiss and Andrea L. Labov, Assistant United States Attorneys, of counsel), for Appellee.

Before OAKES, KEARSE, and WINTER, Circuit Judges.

OAKES, Senior Circuit Judge:

Charles Kim was convicted of wire fraud and conspiracy based on his approving for payment inflated travel invoices submitted to the United Nations as part of its peace-keeping mission in Bosnia–Herzegovina. The United States District Court for the Southern District of New York, Barbara S. Jones, *Judge*, entered Kim's conviction pursuant to a jury verdict. In this appeal, Kim argues that neither jurisdiction nor venue was proper in the Southern District, and further argues that the district court erred in its evidentiary rulings and sentencing calculation. Because we find that jurisdiction and venue were proper under the wire fraud statute, and find no error on the part of the district court with respect to the other claims, we affirm.

## BACKGROUND

In 1992, the United Nations established a peacekeeping mission in Bosnia–Herzegovina (the "UNMIBH"), stationing there military observers and civilian police who were citizens of various United Nations member states. The UNMIBH incurred substantial travel expenses with commercial airlines for the transportation of these peacekeepers to and from Bosnia–Herzegovina. Between 1995 and 1998, Kim, a resident of New York, was stationed in Zagreb, Croatia, as the UNMIBH's Chief

of Travel and Traffic. In that capacity, he was responsible for making the travel arrangements for peacekeepers and approving invoices submitted by travel agencies and airlines.

Several commercial airlines used by the UNMIBH offered the mission substantial baggage discounts in the form of carrying up to 120 kilograms of each peacekeeper's baggage without charge. The government alleged that Kim knew of these discounts but nevertheless approved payment of invoices containing more than half a million dollars in improper baggage charges. These improper charges were made in two separate schemes, one involving a Croatian travel agency called Zagrebtours and the other involving Air France, in which Kim colluded with employees of those entities to defraud the UNMIBH. The Zagrebtours scheme occurred between October 1996 and September 1998, while the Air France scheme occurred between July 1996 and January 1998.

In each scheme, payment of the inflated invoices approved by Kim was done by wire transfer. Upon receiving Kim's approval, the UNMIBH chief cashier would, by fax, direct its bank to pay the relevant entity. From July 1997 forward, the UNMIBH paid its travel vendors by wire transfer from the Chase Manhattan Bank in New York City. The UNMIBH cashier testified at trial that on at least two occasions during the time the schemes were ongoing, she told Kim that the invoices were being paid by Chase Manhattan.

Prior to trial, Kim moved to dismiss his indictment for lack of jurisdiction and venue. His motion was denied by the district court on July 15, 1999, after full briefing by the parties. Kim then filed with this Court a petition for mandamus seeking to overturn the pre-trial rulings, which was denied on August 25, 1999. On September 28, 1999, after a two-week trial, a jury

convicted Kim of five counts of wire fraud and conspiracy to commit wire fraud. Kim was sentenced on May 12, 2000, and subsequently moved in this Court for bail pending appeal on the ground that his conviction was likely to be overturned on the bases of jurisdiction and venue. Kim's motion was denied on August 18, 2000, and this appeal followed.

## DISCUSSION

■ Kim principally challenges his conviction with the argument that because neither he nor any of his co-conspirators personally committed any fraudulent or conspiratorial act while in the United States, jurisdiction and venue were lacking to prosecute him in the Southern District of New York. Because the questions of jurisdiction and venue are questions of law, we review them *de novo*. *See United States v. White*, 237 F.3d 170, 172 (2d Cir.2001).

### I. *Jurisdiction*

Kim asserts that the district court lacked jurisdiction in this case because none of his conduct, or that of his co-conspirators, occurred in the United States and the wire fraud statute under which he was prosecuted was not intended to apply to an entirely foreign fraud. The government argues that the language and legislative history of the wire fraud statute, as well as precedent in this Court, make it clear that the statute applies when foreign frauds are committed by American citizens and furthered by wires into or out of the United States. On this question of statutory construction, we agree with the Government.

■ At the outset, we note that although there is no general bar against the extraterritorial application of our criminal laws to American citizens, the Supreme Court has long recognized a presumption

against such applications. *See Sale v. Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 173, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). The presumption against extraterritorial application is overcome, however, when it is clear that Congress intends the statute to cover conduct that occurs outside the United States. *See EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). We must therefore determine whether Congress clearly intended that the statute at issue here apply to foreign conduct. In so doing, we "are permitted to consider 'all available evidence' about the meaning of the statute, including its text, structure, and legislative history." *United States v. Gatlin,* 216 F.3d 207, 212 (2d Cir.2000) (quoting *Sale,* 509 U.S. at 177, 113 S.Ct. 2549).

■ The wire fraud statute, 18 U.S.C.A. § 1343 (2000), criminalizes the use of wire transmissions to further a fraudulent scheme.[1] In 1956, Congress amended the statute to include the words "foreign commerce" so as to reach fraud schemes furthered by foreign wires as well as by interstate wires. *See* 18 U.S.C.A. § 1343, Historical and Statutory Notes. The legislative history of this amendment, while terse, is telling. The amendment was prompted by the failed prosecution of an individual who made a fraudulent telephone call from Mexico to the United States and successfully argued that § 1343 did not cover such a foreign communication. *See* S.Rep. No. 1873, 84th Cong., 2d Sess. 2 (1956). With this case in mind, Congress acted to "close [the] loophole" that limited prosecution to cases in which the fraudulent transmission occurred between two states, and explicitly extended the coverage of § 1343 to foreign communications. *See* H.R.Rep. No. 2385, 84th Cong., 2d Sess. 1 (1956), *reprinted in* 1956 U.S.C.C.A.N. 3091, 3092.

Kim urges us to interpret § 1343's admittedly slim legislative history as a congressional retention of the focus on domestic fraud, and not an expansion of statutory coverage to frauds committed abroad. As the Government points out, however, the fraud at issue here involved an American perpetrator and a victim headquartered in New York. That the fraudulent scheme was implemented while Kim was located in Croatia—but furthered by wire transmissions to and from New York—makes it similar to the Mexico/America fraud that prompted Congress to enact the 1956 amendment to § 1343. As we have recognized in an analogous context:

> There would seem to be no logical reason for holding that Congress intended to punish those who cause the violation of a law regulating and protecting foreign commerce *only* when they act within the borders of the United States or that Congress is powerless to protect foreign commerce and those who engage in foreign commerce from intentionally injurious acts, simply because those acts occur outside our borders.

*United States v. Braverman,* 376 F.2d 249, 251 (2d Cir.1967). We therefore believe that Congress clearly intended conduct such as Kim's to be within the reach of our criminal laws.

Our conclusion here flows from the earlier holdings of this Court in *United States*

---

1. The statute reads in relevant part:

   § 1343. Fraud by wire, radio, or television

   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings ... for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

*v. Gilboe,* 684 F.2d 235 (2d Cir.1982), and *United States v. Trapilo,* 130 F.3d 547 (2d Cir.1997). In *Gilboe,* we addressed jurisdiction under § 1343 for a nonresident alien who had perpetrated a massive fraud on the international shipping industry. *See* 684 F.2d at 236–37. Rejecting the defendant's arguments that the fraudulent acts occurred outside the United States and had no detrimental effects within it, we held that wire communications between Hong Kong and Manhattan, and Hong Kong and Bayshore, Long Island, were "clearly sufficient to sustain jurisdiction on th[e] offense," because "jurisdiction under § 1343 is satisfied by defendant's use of the wires to obtain the proceeds of his fraudulent scheme." *Id.* at 238.

In *Trapilo,* we interpreted § 1343 in the context of a tax revenue fraud on the Canadian government, and concluded that the statute covered such a fraud. *See* 130 F.3d at 551–553. Looking at the language of the statute, we found that "as the statute plainly states, what is proscribed is use of the telecommunication systems of the United States in furtherance of a scheme.... Nothing more is required. The identity and location of the victim, and the success of the scheme, are irrelevant." *Id.* at 552.

■ The holdings in *Gilboe* and *Trapilo* are directly applicable to the instant case and dictate that § 1343 provides jurisdiction over Kim. Kim nevertheless argues that we should ignore this binding precedent because those cases involved defendants who themselves used wire communications in furtherance of their schemes, while in Kim's scheme the wires were sent and received by innocent parties. This argument fails to comprehend the parameters of the wire fraud statute. The statutory language of § 1343 makes one guilty of wire fraud if he "transmits or causes to be transmitted," and we have found that

one causes a wire transmission when he "act[s] 'with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen.'" *United States v. Zichettello,* 208 F.3d 72, 106 (2d Cir.2000) (internal brackets omitted) (quoting *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). Thus, it makes no difference that Kim did not himself send the wires. The jury, having heard evidence that Kim knew the fraudulent invoices he approved were being paid by a New York bank, found that the causation element had been satisfied in this case, and we see no reason to disagree.

Kim further argues that we should discard the teaching of *Trapilo* and *Gilboe* in favor of two civil cases which held that subject matter jurisdiction was lacking in RICO complaints charging predicate acts of wire fraud. *See North South Finance Corp. v. Al–Turki,* 100 F.3d 1046 (2d Cir. 1996); *Butte Mining PLC v. Smith,* 76 F.3d 287 (9th Cir.1996). Setting aside the fact that these civil cases are not directly on point, we find Kim's reliance upon them misplaced for several reasons. First, our analysis in the *North South Finance* case started with the acknowledgment that "[t]he RICO statute is silent as to any extraterritorial application." *North South Finance,* 100 F.3d at 1051. Here, the language of § 1343 explicitly addresses its application to foreign communications. Second, in both *North South Finance* and *Butte Mining,* the wire transmissions at issue were found to be "merely preparatory to the fraud," rather than, as here, "material to the completion of the fraud." *Id.* at 1053; *see Butte Mining,* 76 F.3d at 291. Finally, the parties in those cases were primarily foreign citizens and entities, not American citizens like Kim or entities headquartered in the United States like the United Nations. These

cases therefore offer no good grounds for reversal here.

■ As we stated in *Trapilo*, "[o]ur goal is simply to vindicate the intended purpose of the statute, that is, 'to prevent the use of [our telecommunication systems] in furtherance of fraudulent enterprises.'" 130 F.3d at 553 (quoting *United States v. Von Barta*, 635 F.2d 999, 1005 (2d Cir.1980)). Such a goal is best met by the conclusion that the district court had jurisdiction over this case.[2]

## II. *Venue*

Kim alleges that venue in the Southern District of New York was improper because neither he nor any of his co-conspirators committed any acts in furtherance of their scheme in that district. It is Kim's position that the faxes and wire transfers sent to and by Chase Manhattan bank are not sufficiently essential conduct to the crime of wire fraud as to support venue. As on the jurisdictional point, we find Kim's arguments unavailing.

Pursuant to the Sixth Amendment and Fed.R.Crim.P. 18, venue is proper in any district where a crime was "committed." *See United States v. Saavedra*, 223 F.3d 85, 88 (2d Cir.2000). The challenge, of course, comes in determining what "committed" means for the purposes of a specific crime. In performing such an inquiry, our court has traditionally looked at the "key verbs" defining the criminal offense.

*See United States v. Brennan*, 183 F.3d 139, 145 (2d Cir.1999); *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1189 (2d Cir.1989). The Supreme Court, however, recently warned against an overly rigid application of the key verb test, in which other relevant statutory language might be ignored and prohibited conduct missed. *See United States v. Rodriguez–Moreno*, 526 U.S. 275, 280, 119 S.Ct. 1239, 143 L.Ed.2d 388 (1999). Instead, the Supreme Court directed courts to first identify the conduct constituting the offense and then determine where that conduct occurred. *See id.* at 279, 119 S.Ct. 1239; *United States v. Cabrales*, 524 U.S. 1, 6–7, 118 S.Ct. 1772, 141 L.Ed.2d 1 (1998).

■ In this case, the district court found that wire fraud was a continuing violation within the meaning of the first paragraph of 18 U.S.C. § 3237(a),[3] for which venue was proper in any district in which the offense began, continued, or concluded. The district court looked to the language of the wire fraud statute to discern the acts comprising the crime, then determined from the facts before it whether any of those acts began, continued, or were completed in the Southern District. Finding that the act of causing a wire to be transmitted in furtherance of a fraud is criminalized by the statute, and that a wire is "transmitted" both where it was sent and where it was received, the district court concluded that the transmissions to

---

**2.** Because there was jurisdiction over the wire fraud counts against Kim, there was also jurisdiction over the conspiracy counts. *See United States v. Blackmon*, 839 F.2d 900, 910–11 (2d Cir.1988).

**3.** 18 U.S.C. § 3237(a) reads:

§ 3237. Offenses begun in one district and completed in another.

(a) Except as otherwise expressly provided by enactment of Congress, any offense against the United States ... committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Any offense involving the use of the mails [or] transportation in interstate or foreign commerce ... is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce [or] mail matter ... moves.

and from Chase Manhattan bank established venue in the Southern District.

We need look no further than our holding in *Gilboe* to affirm the district court's conclusion. As described above, *Gilboe* concerned an international shipping fraud in which the defendant made telephone and telex calls from his base in Hong Kong to Manhattan. *See* 684 F.2d at 239. Like Kim, Gilboe was never actually present in the Southern District and argued that venue was therefore improper. After finding that the appropriate venue provision was § 3237(a), we held that the communications to and from New York were sufficient to support venue for Gilboe's prosecution in the Southern District. *See id.*[4] We can see no reason to reach a different result here.

Kim makes several arguments against the venue analysis conducted in his case, all of which center on the fact that none of his personal conduct occurred in Manhattan. First, he claims that *Gilboe* is distinguishable on the ground that the defendant personally made the phone calls to New York that established venue there. Second, he asserts that our holdings in *Brennan* and *Beech–Nut* require that he actually have committed some act in the Southern District to satisfy venue requirements. Finally, he relies on a district court case, *United States v. Bezmalinovic*, 962 F.Supp. 435 (S.D.N.Y.1997), to argue that because he did not direct or control any conduct in Manhattan, venue was improper. We find all these arguments to be unconvincing.

■ With respect to the distinction that Kim would like to draw between *Gilboe* and this case, we cannot agree that just because Kim did not personally send the

faxes requesting payment to Chase Manhattan, these communications are insufficient to establish venue. Indeed, in *Gilboe* we did not stress that it was the defendant's personal conduct that made venue proper, but simply that "there were numerous telexes and telephone calls between New York and Hong Kong." 684 F.2d at 239. Here, Kim caused communications to be transmitted into and out of the Southern District when he approved fraudulent invoices knowing that the UN-MIBH paid its vendors from New York banks. The fact that he was not in Manhattan when he caused the wire transmissions does not eliminate the connection between Kim's acts and the Southern District for the purposes of venue.

Rather than apply *Gilboe*, Kim asks us to extend our holdings in the *Brennan* and *Beech–Nut* cases. In *Brennan*, a mail fraud case which interpreted the second paragraph of § 3237(a), we held that venue does not lie in districts through which mail travels after it is mailed but before it is delivered. *See* 183 F.3d at 146–47. Kim argues by analogy that because he performed no causative act in Manhattan, the wire communications in this case were simply "passing through" the Southern District like the traveling mail in *Brennan*. The district court correctly rejected this argument on two grounds: (1) that *Brennan* did not examine venue under the first paragraph of § 3237(a), and its holding does not impact that paragraph; and (2) that wire fraud is a continuing violation under § 3237(a)'s first paragraph, and venue is proper because Manhattan served as the place in which wires that Kim caused to be transmitted began and continued. Additionally, we reject the notion that the

---

4. We also found that because the proceeds of Gilboe's fraud were transferred through New York, they were foreign commerce that moved "from, through, or into" the Southern District pursuant to the second paragraph of § 3237(a). We do not rely here on this alternative basis for the holding in *Gilboe*.

very wires which caused the fraud to bear fruit through payment by Chase Manhattan can be characterized as just passing through the Southern District. We therefore agree with the district court that *Brennan* does not control the outcome in this case.

Kim is no better served by his reliance on *Beech–Nut.* In that case, the government sought to establish venue in a district in which the defendants had placed orders for adulterated apple juice concentrate. 871 F.2d at 1189–90. We concluded that these acts were "merely prior and preparatory to th[e] offense" of introducing adulterated juice into commerce and thus were insufficient to establish venue. *Id.* at 1190. We found "no authorization in § 3237 for venue in a district whose sole connection with the offense in question is that it was a site of preparation for the offense." *Id.* Here, Kim's acts—causing fraudulent communications that began or continued in the Southern District—were hardly preparatory. Perhaps if Kim had simply caused the fax machine on which the fraudulent invoices were transmitted to be bought in Manhattan, he would have a better argument under *Beech–Nut.* Under the circumstances, however, *Beech–Nut* is of limited utility.

Finally, in *Bezmalinovic,* the district court case cited by Kim, the court concluded that venue for a charge of bank fraud did not lie in the Southern District when the only acts that occurred there were ministerial ones not intended or foreseen by the defendant. *See* 962 F.Supp. at 441. We are not, of course, bound by the result in this case, but it is distinguishable in any event. As we discussed above with respect to jurisdiction, the evidence at trial established that Kim knew the fraudulent invoices would be paid by a bank in New York. The acts that occurred in Manhattan were therefore both foreseeable to Kim and within his control, as he was the one approving the invoices for payment.

As we recently stated in *Saavedra,* where we found venue proper in a district where defendants were not physically present during the commission of the offense, venue must be based on an "element *essential* to the conduct the statute criminalizes." 223 F.3d at 92. Despite Kim's arguments to the contrary, we believe that the wire communications to and from Manhattan were essential to the continuing offense of causing fraudulent wires to be transmitted. We therefore hold that venue properly lay in the Southern District.[5]

## III.  *Other Arguments*

In addition to his primary challenges to jurisdiction and venue, Kim also argues that the district court erred in calculating the offense level for sentencing because it included losses to the UNMIBH incurred before wire transmissions to New York began and further erred in an evidentiary ruling on the statement of a co-conspirator. We have considered Kim's arguments on these points and find them to be without merit.

---

**5.** Kim does not aggressively argue against venue with respect to the conspiracy charge, but does claim that venue was improper for those counts as well. In *United States v. Smith,* 198 F.3d 377 (2d Cir.1999), we found that "[i]n a conspiracy prosecution, 'venue is proper in any district in which an overt act … was committed by any of the coconspirators.'" *Id.* at 382 (quoting *United States v. Naranjo,* 14 F.3d 145, 147 (2d Cir.1994)). We found that the defendant need not be present in the district, and that phone calls to or from the district "by themselves can establish venue … as long as the calls further the conspiracy." *Id.* Because the wire communications in this case were part of a continuing violation by Kim and clearly furthered the conspiracy, we find that venue was proper for the conspiracy counts.

## CONCLUSION

In light of the foregoing, we affirm Kim's judgment of conviction.